**SHEEHAN & ASSOCIATES, P.C.**
Spencer Sheehan
505 Northern Blvd Ste 311
Great Neck NY 11021-5101
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*

United States District Court
Southern District of New York                                        1:20-cv-00493

| | |
|---|---|
| Tania Pichardo, individually and on behalf of all others similarly situated,<br><br>                 Plaintiff,<br><br>       - against -<br><br>Only What You Need, Inc.,<br><br>                 Defendant | Class Action Complaint |

       Plaintiff by attorneys alleges upon information and belief, except for allegations pertaining to plaintiff, which are based on personal knowledge:

    1.     Only What You Need, Inc. ("defendant") manufactures, distributes, markets, labels and sells non-dairy plant protein beverages purporting to be flavored only with vanilla under their OWYN brand ("Products").

    2.     The Products are available to consumers from retail and online stores of third-parties and defendant's website and are sold in bottles of 12 OZ (355 ML).

    3.     The relevant front label representations include the brand name, "OWYN" and "Only What You Need," "20g Protein," "plant-based drink," "Smooth Vanilla" and a vignette of the vanilla flower and vanilla beans.



4.    The Product's side panel contains the Nutrition Facts and ingredient list.



**INGREDIENTS:** Water, OWYN Protein Blend (Pea Protein, Organic Pumpkin Seed Protein, Organic Flax Oil), Vegetable Fiber, Organic Cane Sugar, Sunflower Oil, Natural Flavors, Sunflower Lecithin, Guar Gum, Greens Blend (Broccoli, Spinach, Kale) Monk Fruit Extract, Himalayan Pink Salt.

I.    Vanilla is Constantly Subject to Efforts at Imitation Due to High Demand

5.    The tropical orchid of the genus Vanilla (*V. planifolia*) is the source of the prized flavor commonly known as vanilla, defined by law as "the total sapid and odorous principles

2

extractable from one-unit weight of vanilla beans."[1]

6.    Vanilla's "desirable flavor attributes…make it one of the most common ingredients used in the global marketplace, whether as a primary flavor, as a component of another flavor, or for its desirable aroma qualities."[2]

7.    Though the Pure Food and Drugs Act of 1906 ("Pure Food Act") was enacted to "protect consumer health and prevent commercial fraud," this was but one episode in the perpetual struggle against those who have sought profit through sale of imitation and lower quality commodities, dressed up as the genuine articles.[3]

8.    It was evident that protecting consumers from fraudulent vanilla would be challenging, as E. M. Chace, Assistant Chief of the Foods Division of the U.S. Department of Agriculture's Bureau of Chemistry, noted "There is at least three times as much vanilla consumed [in the United States] as all other flavors together."[4]

9.    This demand could not be met by the natural sources of vanilla, leading manufacturers to devise clever, deceptive and dangerous methods to imitate vanilla's flavor and appearance.

10.    Today, headlines tell a story of a resurgent global threat of "food fraud" – from olive oil made from cottonseeds to the horsemeat scandal in the European Union.[5]

---

[1] 21 C.F.R. §169.3(c).

[2] Daphna Havkin-Frenkel, F.C. Bellanger, Eds., Handbook of Vanilla Science and Technology, Wiley, 2018.

[3] Berenstein, 412; some of the earliest recorded examples of food fraud include unscrupulous Roman merchants who sweetened wine with lead.

[4] E. M. Chace, "The Manufacture of Flavoring Extracts," Yearbook of the United States Department of Agriculture 1908 (Washington, DC: Government Printing Office, 1909) pp.333–42, 333 quoted in Nadia Berenstein,  "Making a global sensation: Vanilla flavor, synthetic chemistry, and the meanings of purity," History of Science 54.4 (2016): 399-424 at 399.

[5] Jenny Eagle, 'Today's complex, fragmented, global food supply chains have led to an increase in food fraud', FoodNavigator.com, Feb. 20, 2019; M. Dourado et al., Do we really know what's in our plate?, Annals of Medicine, 51(sup1), 179-179 (May 2019); Aline Wisniewski et al., "How to tackle food fraud in official food control authorities in Germany." Journal of Consumer Protection and Food Safety: 1-10. June 11, 2019.

11.    Though "food fraud" has no agreed-upon definition, its typologies encompass an ever-expanding, often overlapping range of techniques with one common goal: giving consumers less than what they bargained for.

A.  Food Fraud as Applied to Vanilla

12.    Vanilla is considered a "high-risk [for food fraud] product because of the multiple market impact factors such as natural disasters in the source regions, unstable production, wide variability of quality and value of vanilla flavorings," second only to saffron in price.[6]

13.    The efforts at imitating vanilla offers a lens to the types of food fraud regularly employed across the spectrum of valuable commodities in today's interconnected world.[7]

| Type of Food Fraud | Application to Vanilla |
| --- | --- |
| ➢ Addition of markers specifically tested for instead of natural component of vanilla beans | • Manipulation of the carbon isotope ratios to produce synthetic vanillin with similar carbon isotope composition to natural vanilla |
| ➢ Appearance of *more* and/or higher quality of the valued ingredient | • Ground vanilla beans and/or seeds to provide visual appeal as "specks" so consumer thinks the product contains real vanilla beans, when the ground beans have been exhausted of flavor<br>• Caramel to darken the color of an imitation vanilla so it more closely resembles the hue of real vanilla[8]<br>• Annatto and turmeric extracts in dairy products purporting to be flavored with vanilla, which causes the color to better |

[6] Société Générale de Surveillance SA, ("SGS "), Authenticity Testing of Vanilla Flavors – Alignment Between Source Material, Claims and Regulation, May 2019.
[7] Kathleen Wybourn, DNV GL, Understanding Food Fraud and Mitigation Strategies, PowerPoint Presentation, Mar. 16, 2016.
[8] Renée Johnson, "Food fraud and economically motivated adulteration of food and food ingredients." Congressional Research Service R43358, January 10, 2014.

resemble the hue of rich, yellow butter

➢ Substitution and replacement of a high quality ingredient with alternate ingredient of lower quality

- Tonka beans, though similar in appearance to vanilla beans, are banned from entry to the United States due to fraudulent use
- Coumarin, a toxic phytochemical found in Tonka beans, added to imitation vanillas to increase vanilla flavor perception

➢ Addition of less expensive substitute ingredient to mimic flavor of more valuable component

- Synthetically produced ethyl vanillin, derived from recycled paper, tree bark or coal tar, to imitate taste of real vanilla

➢ Compounding, Diluting, Extending

- "to mix flavor materials together at a special ratio in which they [sic] compliment each other to give the desirable aroma and taste"[9]
- Combination with flavoring substances such as propenyl guaethol ("Vanitrope"), a "flavoring agent [, also] unconnected to vanilla beans or vanillin, but unmistakably producing the sensation of vanilla"[10]
- "Spiking" or "fortification" of vanilla through addition of natural and artificial flavors including vanillin, which simulates vanilla taste but obtained from tree bark

➢ Addition of fillers to give the impression there is more of the product than there actually is

- Injection of vanilla beans with mercury, a poisonous substance, to raise the weight of vanilla beans, alleged in *International Flavors and Fragrances (IFF), Inc. v. Day Pitney LLP and Robert G. Rose,* 2005, Docket Number L-4486-09, Superior Court of New Jersey, Middlesex

---

[9] Chee-Teck Tan, "Physical Chemistry in Flavor Products Preparation: An Overview" in Flavor Technology, ACS Symposium Series, Vol. 610 1995. 1-17.
[10] Berenstein, 423.

County.

- Subtle, yet deliberate misidentification and obfuscation of a product's components and qualities as they appear on the ingredient list

  o "ground vanilla beans" gives impression it describes unexhausted vanilla beans when actually it is devoid of flavor and used for aesthetics

➢ Ingredient List Deception[11]

  o "natural vanilla flavorings" – "-ing" as suffix referring to something *like* that which is described

  o "Vanilla With Other Natural Flavors" – implying – wrongly – such a product has a sufficient amount of vanilla to characterize the food

  o "Natural Flavors" – containing "natural vanillin" derived not from vanilla beans but from tree pulp. When paired with real vanilla, vanillin is required to be declared as an artificial flavor

B. <u>The Use of Vanillin to Simulate Vanilla</u>

14.  The most persistent challenger to the authenticity of real vanilla has been synthetic versions of its main flavor component, vanillin.

15.  First synthesized from non-vanilla sources by German chemists in the mid-1800s, vanillin was the equivalent of steroids for vanilla flavor.

16.  According to Skip Rosskam, a professor of vanilla at Penn State University and former head of the David Michael flavor house in Philadelphia, "one ounce of vanillin is equal to

---

[11] Recent example of this would be "evaporated cane juice" as a more healthful sounding term to consumers to identify sugar.

a full gallon of single-fold vanilla extract."[12]

17.    Today, only 1-2% of vanillin in commercial use is vanillin obtained from the vanilla plant, which means that almost all vanillin has no connection to the vanilla bean.

18.    Nevertheless, disclosure of this powerful ingredient has always been required where a product purports to be flavored with vanilla. *See* Kansas State Board of Health, Bulletin, Vol. 7, 1911, p. 168 (cautioning consumers that flavor combinations such as "vanilla and vanillin…vanilla flavor compound," etc., are not "vanilla [extract] no matter what claims, explanations or formulas are given on the label.").

19.    Since vanilla is the only flavor with its own standard of identity, its labeling is controlled not by the general flavor regulations but by the standards for vanilla ingredients.

20.    This means that if a product is represented as being characterized by vanilla yet also contains non-vanilla vanillin, the label and packaging must declare the presence of vanillin and identify it as an artificial flavor. *See* Vanilla-vanillin extract at 21 C.F.R. § 169.180(b) ("The specified name of the food is "Vanilla-vanillin extract _-fold" or "_-fold vanilla-vanillin extract", followed immediately by the statement "contains vanillin, an artificial flavor (or flavoring)".); *see also* 21 C.F.R. § 169.181(b), § 169.182(b) (similar declarations required for Vanilla-vanillin flavoring and Vanilla-vanillin powder).

21.    This prevents consumers from being misled by products which may taste similar to real vanilla and but for consumer protection requirements, would be sold at the price of real vanilla.

C.    Emphasis on Producing "Natural Vanillins" and Pairing with "Natural Vanilla"

22.    "Natural vanillin" is not a "natural vanilla flavor" because the raw material is

---

[12] Katy Severson, Imitation vs. Real Vanilla: Scientists Explain How Baking Affects Flavor, Huffington Post, May 21, 2019.

typically petrochemicals or tree pulp instead of vanilla beans.

23.   The past ten years have seen many vanillins purporting to be a "natural flavor" because the natural source raw material undergoes a natural production process, i.e., fermentation.

24.   The two main natural sources are ferulic acid and eugenol, from cloves.

25.   Converting ferulic acid to vanillin through fermentation is cost prohibitive for almost all applications.

26.   Eugenol is also claimed to be a source for "natural vanillin" but it is subjected to chemical reactions and processes considered to be synthetic by the FDA.

27.   However, since this is produced in China with no transparency or verification, there is nothing to stop this ingredient from being labeled as "natural vanillin" through the supply chain until it misleads consumers.

D.   "Flavorless" Flavor Ingredients Used to Mislead Consumers and Regulators

28.   A well-known effort at circumventing the law to deceive consumers was the development of *Vanguard* in the late 1970s by David Michael & Co., Inc., currently part of International Flavors & Fragrances ("IFF").

29.   Supposedly reacting to vanilla shortages, David Michael developed a "flavorless" "natural flavor enhancer" that "contain[ed] no vanilla, vanillin, ethyl vanillin, or any artificial flavor."

30.   Instead, the components were "blend[s] of dozens of plant extractives, roots, and botanicals, all natural ingredients found on the GRAS list."

31.   On ingredient lists, a product made with Vanguard would state "vanilla extract, natural flavor" and its usage was said to reduce the amount of real vanilla used by up to half.

32.   David Michael promoted Vanguard across vanilla flavored foods by telling potential

8

buyers they only needed to label their products as "vanilla," since the non-vanilla natural flavor did not affect the characterizing flavor of vanilla nor did it resemble, enhance or simulate vanilla.

33.    In subsequent years, the use of Vanguard and similar ingredients would be justified on the basis they only (1) "rounded out" harsher notes and ancillary flavors and (2) flavors "masked" unpleasant dairy and off-flavors.

34.    Several years later, the FDA rejected the sophistry of David Michael and restored vanilla to its status as first among equals amongst the flavors.

E.    <u>"Masking Flavors" Enable Usage of Less of the Characterizing Flavor</u>

35.    A "masking" flavor is said to block or limit a taste sensation caused by other ingredients and be non-detectable.

36.    Masking flavors are claimed to work "in the background with the characterizing notes, elevating them to their true potential" and "subdu[ing] off flavors from other ingredients…allowing the characterizing flavor to shine."[13]

37.    By making the food taste like it contains more and/or a stronger amounts of the characterizing flavor, the characterizing flavor is reinforced and/or extended (a smaller amount is stretched to have a greater effect), allowing the food to contain less of the characterizing ingredient.

38.    Non-vanilla flavor in the form of a masking flavor would then be required to be declared on a product's front label.  *See* 21 C.F.R. § 101.22(i)(1)(iii) ("other natural flavor which simulates, resembles or reinforces the characterizing flavor").

II.    Flavor Industry's Efforts to Use Less Vanilla, Regardless of any Shortages

39.    The "flavor industry" refers to the largest "flavor houses" such as Symrise AG,

---

[13] Donna Berry, <u>Modifying Flavor in Dairy Foods</u>, April 11, 2018, Food Business News.

Firmenich, Givaudan, International Flavors and Fragrances (including David Michael), Frutarom and Takasago International along with the largest food manufacturing companies such as Unilever.

40.    The more recent global shortage of vanilla beans has again forced the flavor industry to "innovate[ing] natural vanilla solutions…to protect our existing customers."[14]

41.    Their "customers" do not include the impoverished vanilla farmers who are at the mercy of these global conglomerates nor consumers, who are sold products labeled as "vanilla" for the same or higher prices than when those products contained *only* vanilla.

42.    These efforts include (1) market disruption and manipulation and (2) the development of alternatives to vanilla which completely or partially replace vanilla.

A.    Flavor Industry's Attempt to Disrupt Supply of Vanilla to Create a "Permanent Shortage"

43.    On the surface, the flavor industry has developed schemes such as the "Sustainable Vanilla Initiative" and "Rainforest Alliance Certified," to assure a significant supply of vanilla at stable, reasonable prices while also looking out for the impoverished farmers.

44.    Reports have circulated that contrary to promoting "sustainability" of vanilla, these programs make vanilla less "sustainable" by paying cash to farmers to destroy their vanilla crops under the guide of "crop diversification" and switching to the ubiquitous palm oil.

45.    There have also been allegations that Unilever's Rainforest Alliance Certified Program uses child and/or slave labor.

46.    Other tactics alleged to be utilized by companies such as IFF, Syrmise and Givaudan include "phantom bidding," where saboteurs claim they will pay a higher price to small producers, only to leave the farmers in the lurch, forced to sell at bottom dollar to remaining bidders.[15]

---

[14] Amanda Del Buono, Ingredient Spotlight, Beverage Industry, Oct. 3, 2016.
[15] Monte Reel, The Volatile Economics of Natural Vanilla in Madagascar, Bloomberg.com, Dec. 16, 2019.

47.     The reasons the flavor companies take what seems to be counterintuitive actions is because they benefit from high vanilla prices and the use of less real vanilla.

48.     When less vanilla is used due to higher prices, companies are compelled to purchase the higher margin, proprietary, "vanilla-like" flavorings made with advanced technology and synthetic biology.

B.   Use of Vanilla WONF Ingredients to Replace and Provide Less Vanilla

49.     Though flavor companies will not admit the above allegations, the conclusions are consistent with the comments of industry executives.

50.     According to Suzanne Johnson, vice president or research at a North Carolina laboratory, "Many companies are trying to switch to natural vanilla with other natural flavors [WONF] in order to keep a high-quality taste at a lower price," known as "Vanilla WONF."

51.     The head of "taste solutions" at Irish conglomerate Kerry urged flavor manufacturers to "[G]et creative" and "build a compounded vanilla flavor with other natural flavors."

52.     A compounded vanilla flavor "that matches the taste of pure vanilla natural extracts" can supposedly "provide the same vanilla taste expectation while requiring a smaller quantity of vanilla beans. The result is a greater consistency in pricing, availability and quality."[16]

53.     These compounded flavors typically exist in a "black box" and "consist of as many as 100 or more flavor ingredients," including potentiators and enhancers, like maltol and piperonal, and added vanillin, blended together to enhance the vanilla, allowing the use of less vanilla to achieve the intended taste.[17]

---

[16] Donna Berry, Understanding the limitations of natural flavors, BakingBusiness.com, Jan. 16, 2018.
[17] Hallagan and Drake, FEMA GRAS and U.S. Regulatory Authority: U.S. Flavor and Food Labeling Implications, Perfumer & Flavorist, Oct. 25, 2018; Charles Zapsalis et al., *Food chemistry and nutritional biochemistry*. Wiley, 1985, p. 611 (describing the flavor industry's goal to develop vanilla compound flavors "That *Seem*[s] to be Authentic or at Least Derived from a Natural Source") (emphasis added).

54.     The effort to replace vanilla with so-called Vanilla WONF started in the late 1960s, but the last 10 years have seen the proliferation of this ingredient.

55.     There are two types of Vanilla WONF, which contains a nominal amount of vanilla.

56.     One version of Vanilla WONF contains high amounts of "natural vanillin."

57.     This ingredient is deceptively identified as "Natural Flavor" because vanillin has always been an artificial flavor when used with vanilla.

58.     The other type of Vanilla WONF is similar to a vanilla combined with an ingredient like Vanguard.

59.     Whether declared on an ingredient list as "Natural Flavor" or "Vanilla Extract, Natural Flavor," the non-vanilla component will contain flavor "enhancers" or "extenders" like piperonal, maltol and ethyl maltol.

C.  Decline of Industry Self-Governance

60.     That high level executives in the flavor industry are willing to openly boast of their stratagems to give consumers less vanilla for the same price is not unexpected.

61.     This is due in part to the once powerful and respected trade group for the flavor industry, The Flavor and Extract Manufacturers Association ("FEMA"), abandoning its "self-policing" of misleading vanilla labeling claims and disbanding its Vanilla Committee.

62.     Though FEMA previously opposed efforts of industry to deceive consumers, it cast the general public to the curb in pursuit of membership dues from its largest members, such as Unilever, rumored to have been behind FEMA's abandonment of self-regulation.

III. Flavor Labeling Applied to Products Represented as "Vanilla"

63.     21 C.F.R. § 101.22(i) sets out factors which affect how flavors are designated and

include (1) the presence of "natural flavor," and/or "artificial flavor," (2) whether the natural and artificial flavor simulates, resembles or reinforces the characterizing flavor, (3) whether the natural flavor is obtained from the food ingredient represented as the characterizing flavor – i.e., does the peach flavor come from real peaches or is it synthesized from apricots? and (4) the relative amounts of the different flavor types.  *See* 21 C.F.R. § 101.22(i)(1)(i)-(iii), 21 C.F.R. § 101.22(i)(2).

64.    "Natural flavor" refers to "the essential oil, oleoresin, essence or extractive…which contains the flavoring constituents" from a natural source such as plant material and can refer to combinations of natural flavors. *See* 21 C.F.R. § 101.22(a)(3).

65.    "Artificial flavor" is any substance whose function is to impart flavor that is not derived from a natural source.  *See* 21 C.F.R. § 101.22(a)(1).

66.    The labeling requirements exist because natural flavors are more expensive than artificial flavors, and the source and amount of flavoring in a food affects consumers' willingness to purchase and consume the food.

67.    A product labeled "Vanilla _____" gives the impression that all the flavor (taste sensation and ingredient imparting same) in the product is contributed by vanilla beans. *See* 21 C.F.R. § 101.22(i)(1) (describing a food which contains no simulating artificial flavor and not subject to 21 C.F.R. § 101.22(i)(1)(i)-(iii)).

68.     Assuming a product contains an "amount of characterizing ingredient [vanilla] insufficient to independently characterize the food, or the food contains no such ingredient," the product would be required to be labeled as "Vanilla flavored _____" or "natural vanilla flavored _____ ." *See* 21 C.F.R. § 101.22(i)(1)(i).

69.    The absence of the term "flavored" where a food is labeled "Vanilla" gives consumers the impression the food contains a sufficient amount of vanilla to characterize the food.

70.   If the characterizing flavor is vanilla and none of the natural flavor used is from vanilla, the flavor designation is required to be "artificially flavored" or with the flavor of the product from which the natural flavor is derived, i.e., "clove flavored vanilla _____." *See* 21 C.F.R. § 101.22(i)(1)(ii).

71.   If a food characterized as vanilla contains some vanilla and "other natural flavor which simulates, resembles or reinforces the characterizing flavor [vanilla]," the options for labeling the food are based upon whether it contains a sufficient amount of the characterizing flavor to independently characterize the food. *See* 21 C.F.R. § 101.22(i)(1)(iii) ("the food shall be labeled in accordance with the introductory text and paragraph (i)(1)(i) of this section").

72.   If the food contains a sufficient amount of vanilla to independently characterize the food and "other natural flavor," the labeling would state "Vanilla With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii); *see also* 21 C.F.R. § 101.22(i)(1) ("introductory text" describing scenario where food contains "no artificial flavor which simulates, resembles or reinforces the characterizing flavor," and none of the sub-paragraphs of 21 C.F.R. § 101.22(i)(1) apply).

73.   If the food contains an insufficient amount of vanilla to independently characterize the food and "other natural flavor," the labeling would state "Vanilla Flavored With Other Natural Flavor." *See* 21 C.F.R. § 101.22(i)(1)(iii) referring to "paragraph (i)(1)(i) of this section," 21 C.F.R. § 101.22(i)(1)(i).

A.   Labeling of Flavors on a Food's Ingredient List

74.   If an exclusively vanilla ingredient is added to a food, it is required to be labeled by its common or usual name provided by its standard of identity. *See* 21 C.F.R. § 169.175(b)(1) ("The specified name of the food is 'Vanilla extract' or 'Extract of vanilla'."); *see also* 21 C.F.R. § 169.177(b) ("The specified name of the food is 'Vanilla flavoring.'").

75.    Where a food is represented as vanilla without qualification but the ingredient list indicates one flavoring ingredient, "natural flavor," it means multiple flavor ingredients, compounds, enhancers and adjuvants have been blended together.

76.    Reasons for combining flavors prior to use include: (1) ease of use by managing fewer suppliers, (2) ensuring the flavors complement and enhance each other, (3) the ability to use less of the more expensive flavor, (4) consistency within product batches and (5) volatile nature of flavoring constituents.

IV. The Product is Misleading Because it Contains Non-Vanilla Flavor and/or Components

77.    The Product is required to be labeled consistent with the flavor regulations in 21 C.F.R. §101.22.

78.    The front label statements and/or images of "Vanilla" are understood by consumers to identify a product where (1) vanilla is the characterizing flavor, (2) vanilla is contained in a sufficient amount to flavor the product, (3) the flavor is provided by an exclusively vanilla ingredient, (4) no other flavors simulate, resemble, reinforce, or enhance flavoring from vanilla or permit less real vanilla to be used and (5) vanilla is the exclusive source of flavor.

A.    Ingredient List Declaration of "Natural Flavor" Reveals Flavor is Not Exclusively Vanilla

79.    The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains flavoring other than vanilla.

80.    These Product's ingredient list reveals the flavoring consists of "Natural Flavors."

Ingredient List

**INGREDIENTS:** Water, OWYN Protein Blend (Pea Protein, Organic Pumpkin Seed Protein, Organic Flax Oil), Vegetable Fiber, Organic Cane Sugar, Sunflower Oil, Natural Flavors, Sunflower Lecithin, Guar Gum, Greens Blend (Broccoli, Spinach, Kale) Monk Fruit Extract, Himalayan Pink Salt.

**INGREDIENTS:** Water, OWYN Protein Blend (Pea Protein, Organic Pumpkin Seed Protein, Organic Flax Oil), Vegetable Fiber, Cane Sugar, Sunflower Oil, Natural Flavors, Sunflower Lecithin, Guar Gum, Greens Blend (Broccoli, Spinach, Kale) Monk Fruit Extract, Himalayan Pink Salt.

81.     Defendant may offer a variety of justifications for the presence of non-vanilla flavor in a product whose front label exclusively identifies "vanilla" as the characterizing flavor.

V.      Conclusion

82.     Defendant's branding and packaging of the Products are designed to – and do - deceive, mislead, and defraud consumers.

83.

84.     The amount of the characterizing component, vanilla, has a material bearing on price or consumer acceptance of the Product because it is more expensive and desired by consumers.

85.     The Product is misleading because it does not contain the amount, type and percentage of vanilla as a component of the total flavor ingredients that is required and consistent with consumer expectations.

86.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

87.     Defendant's false, deceptive, and misleading branding and packaging of the Products

has enabled Defendant to sell more of the Products and at higher prices per unit, than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

88.     The value of the Products that Plaintiff actually purchased and consumed was materially less than its value as represented by Defendant.

89.     Had plaintiff and class members known the truth, they would not have bought the Product or would have paid less for it.

90.     The Product contains other representations which are misleading and deceptive.

91.     As a result of the false and misleading labeling, the Product is sold at a premium price, approximately no less than $3.99 per 11 OZ, excluding tax, compared to other similar products represented in a non-misleading way.

<u>Jurisdiction and Venue</u>

92.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332(d)(2) (Class Action Fairness Act of 2005 or "CAFA").

93.     Under CAFA, district courts have "original federal jurisdiction over class actions involving (1) an aggregate amount in controversy of at least $5,000,000; and (2) minimal diversity[.]" *Gold v. New York Life Ins. Co.*, 730 F.3d 137, 141 (2d Cir. 2013).

94.     Upon information and belief, the aggregate amount in controversy is more than $5,000,000.00, exclusive of interests and costs.

95.     This is a reasonable assumption because the Products are sold in thousands of stores across the nation and have been sold bearing the allegedly misleading claims for several years.

96.     Plaintiff is a citizen of New York.

97.     Defendant is a Delaware corporation with a principal place of business in Fairfield, Essex County, New Jersey and is a citizen of New Jersey.

98.    This court has personal jurisdiction over defendant because it conducts and transacts business, contracts to provide and/or supply and provides and/or supplies services and/or goods within New York.

99.    Venue is proper because plaintiff and many class members reside in this District and defendant does business in this District and State.

100.   A substantial part of events and omissions giving rise to the claims occurred in this District.

Parties

101.   Plaintiff is a citizen of Bronx, Bronx County, New York.

102.   Plaintiff Annmarie St. John is a citizen of Suffolk County, New York.

103.   During the relevant statutes of limitations, plaintiffs purchased the Products for personal consumption within this district and/or State.

104.   Plaintiffs paid more for the Products than they otherwise would have if the Products did not have the misleading representations.

105.   Plaintiffs paid a premium price for the Products because prior to purchase, plaintiffs saw and relied on the misleading representations.

106.   Plaintiffs would purchase the Products again if they were assured the representations were no longer misleading.

107.   Defendant is a Delaware corporation with a principal place of business in Bentonville, Arkansas.

108.   Defendant Only What You Need, Inc. is a Delaware corporation with a principal place of business in Fairfield, New Jersey, Essex County.

Class Allegations

109.  The classes will consist of all consumers in New York, the other 49 states and a nationwide class where applicable.

110.  Common questions of law or fact predominate and include whether defendant's representations and practices were likely to harm plaintiff and if plaintiff and class members are entitled to damages.

111.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive actions.

112.  Plaintiff is an adequate representative because her interests do not conflict with other members.

113.  No individual inquiry is necessary since the focus is only on defendant's practices and the class is definable and ascertainable.

114.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

115.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to adequately and fairly protect class members' interests.

116.  Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>New York GBL §§ 349 & 350</u>
<u>(Consumer Protection from Deceptive Acts)</u>

117.  Plaintiff incorporates by reference all preceding paragraphs.

118.  Plaintiff and class members desired to purchase products which were as described by defendant and expected by reasonable consumers, given the product type.

119.  Defendant's acts and omissions are not unique to the parties and have a broader impact on the public.

120.  Defendant's conduct was misleading, deceptive, unlawful, fraudulent, and unfair

because it gives the impression to consumers the Products The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains flavoring other than vanilla.

121.  Plaintiff and class members relied on the representations and paid more for the Products as a result of what defendant stated and omitted about the Products.

122.  Plaintiff  and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

123.  Plaintiff incorporates by reference all preceding paragraphs.

124.  Defendant misrepresented the substantive, quality, compositional, organoleptic and/or nutritional attributes of the Products through representing they The unqualified, prominent and conspicuous representation as "Vanilla" is false, deceptive and misleading because the Product contains flavoring other than vanilla.

125.  Defendant had a duty to disclose and/or provide non-deceptive labeling of the Product and its components and ingredients, and knew or should have known same were false or misleading.

126.  This duty is based on defendant's position as an entity which has held itself out as having special knowledge and experience in the production, service and/or sale of the product or service type.

127.  The representations took advantage of consumers' (1) cognitive shortcuts made at the point-of-sale and (2) trust placed in defendant, a well-known and respected brand in this sector.

128.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, the purchase of the

Products.

129.   Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

Breaches of Express Warranty, Implied Warranty of Merchantability and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

130.   Plaintiff incorporates by reference all preceding paragraphs.

131.   Defendant manufactures and sells products which purport to contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and which enabled use of less of the characterizing flavor.

132.   The Products warranted to plaintiff and class members that they possessed substantive, functional, nutritional, qualitative, compositional, organoleptic, sensory, physical and other attributes which they did not.

133.   Defendant had a duty to disclose and/or provide a non-deceptive description and identification of the Products.

134.   This duty is based, in part, on defendant's position as one of the most recognized companies in the nation in this sector.

135.   Plaintiff provided or will provide notice to defendant, its agents, representatives, retailers and their employees.

136.   Defendant had received or should have been aware of the misrepresentations due to numerous complaints by consumers to its main office over the past several years.

137.   The Products did not conform to their affirmations of fact and promises due to defendant's actions and were not merchantable.

138.   Plaintiff and class members relied on the claims, paying more than they would have.

## Fraud

139.   Plaintiff incorporates by references all preceding paragraphs.

140.   Defendant's purpose was to sell a product which purported to contain sufficient amounts of the highlighted ingredient, vanilla, to independently characterize the taste or flavor of the Products, did not contain other flavor components which simulate, resemble or reinforce the characterizing flavor and which enabled use of less of the characterizing flavor.

141.   Defendant's fraudulent intent is evinced by its failure to accurately identify the Product on the front label.

142.   Plaintiff and class members observed and relied on defendant's claims, causing them to pay more than they would have, entitling them to damages.

## Unjust Enrichment

143.   Plaintiff incorporates by reference all preceding paragraphs.

144.   Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.   Declaring this a proper class action, certifying Plaintiff as representative and undersigned as counsel for the class;

2.   Entering preliminary and permanent injunctive relief by directing defendant to correct the challenged practices to comply with the law;

3.   Injunctive relief to remove, correct and/or refrain from the challenged practices and

representations, restitution and disgorgement for members of the State Subclasses pursuant to the applicable laws of their States;

4. Awarding monetary damages and interest, including treble and punitive damages, pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   January 18, 2020

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan

Spencer Sheehan
505 Northern Blvd., Suite 311
Great Neck, NY 11021
Telephone: (516) 303-0552
Facsimile: (516) 234-7800
*spencer@spencersheehan.com*
E.D.N.Y. # SS-8533
S.D.N.Y. # SS-2056

1:20-cv-00493
United States District Court
Southern District of New York

Tania Pichardo, individually and on behalf of all others similarly situated,

Plaintiff,

- against -

Only What You Need, Inc.,

Defendant

## Class Action Complaint

```
Sheehan & Associates, P.C.
 505 Northern Blvd., #311
   Great Neck, NY 11021
   Tel: (516) 303-0552
   Fax: (516) 234-7800
```

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that, upon information, and belief, formed after an inquiry reasonable under the circumstances, the contentions contained in the annexed documents are not frivolous.

Dated: January 18, 2020

/s/ Spencer Sheehan
Spencer Sheehan